| | |
|---|---|
| OUTDOOR VENTURE CORPORATION, STEARNS MANUFACTURING, KENTUCKY HIGHLANDS INVESTMENT CORPORATION, J.C. EGNEW, and L. RAY MONCRIEF | CIVIL ACTION NO. 6:16-cv-182-KKC |
| **Plaintiffs,** | |
| V. | **OPINION AND ORDER** |
| PHILADELPHIA INDEMNITY INSURANCE COMPANY, GRANGE MUTUAL CASUALTY CO., SCOTTSDALE INDEMNITY COMPANY, AUTO-OWNERS INSURANCE COMPANY, and OWNERS INSURANCE COMPANY | |
| **Defendants.** | |

*** *** ***

This matter is before the Court on the parties' cross-motions for summary judgment (DE 52, 54, 55, 58). The defendants are all insurance companies. The plaintiffs were insured by one or more of the insurance companies. With this action, the insureds primarily seek reimbursement from their insurance companies for the costs they incurred in defending three lawsuits filed against them.

Pursuant to a conference call with the parties and the Court's subsequent order (DE 51), the parties have submitted briefs on the threshold issue of whether the insurance companies had a duty to defend the insureds in the three lawsuits.

## I. Background

The plaintiffs in this matter are three corporations and two individuals who were officers of the corporations.

The three corporations are Stearns Manufacturing and its successor Outdoor Venture Corporation (together, "OVC") and Kentucky Highlands Investment Corporation. (DE 1, Complaint, ¶ 11.) The two individual plaintiffs are J.C. Egnew and L. Ray Moncrief. During at least the relevant time, Egnew was the president of OVC. (DE 1, Complaint, ¶4.) Moncrief was a director of OVC and an officer of Kentucky Highlands (DE 1, Complaint, ¶3.)

The root of this dispute is three lawsuits filed against various of the plaintiffs by a company called LEEP, Inc. and one of LEEP's insiders, Roger Blanken. LEEP alleged that it entered into "joint venture negotiations" with OVC. (DE 52-1, Mem. at 6.) During the negotiations, Egnew signed on OVC's behalf a non-disclosure and non-circumvention agreement (the "NDA") which prevented OVC from contacting LEEP's lenders or customers. (DE 52-1, Mem. at 5.)

Eventually, LEEP and OVC signed a letter of intent which "contemplated the formation of a new company to manufacture, in Kentucky, steel insulated building panels." (DE 52-1, Mem. at 5.) The companies were unable to reach an agreement, however, and negotiations ceased in August 2012. (DE 52-1, Mem. at 6.)

At the time, LEEP owed more than $7 million to Fortress Credit Corporation and was in default under the terms of the parties' financing agreement. (DE 52-1, Mem. at 6.) After joint venture negotiations between LEEP and OVC ceased, Kentucky Highlands purchased Fortress's rights under the financing agreement. Kentucky Highlands then repossessed LEEP's assets and sold the assets to plaintiff Stearns Manufacturing, which is a subsidiary

of OVC. (DE 52-1, Mem. at 6.) Stearns Manufacturing no longer exists; OVC now owns Stearns' assets and liabilities. (DE 52-1, Mem. at 6 n. 5.)

With the three lawsuits underlying this action, LEEP and Blanken asserted that Kentucky Highlands wrongfully repossessed their assets.

The first lawsuit was brought by LEEP in Jefferson Circuit Court against Kentucky Highlands, OVC, Egnew, and Moncrief (the "LEEP lawsuit'). With this lawsuit, LEEP alleged that the insureds had devised a scheme to "force LEEP out of business and to take over LEEP's business by virtue of obtaining LEEP's confidential information and then purchasing the Fortress note." (DE 53-3, LEEP Complaint ¶ 94.) LEEP alleged that, after buying the note, the insureds gave notice of default to LEEP and took possession of LEEP's facility and its assets and "took over LEEP's business and contacted LEEP's customers, all in an effort to destroy LEEP and to take over LEEP's business through unlawful means." (DE 53-3, LEEP Complaint ¶¶ 94-97.) LEEP sought $30 million in damages. (DE 52-1, Mem. at 6.)

The second lawsuit was brought by Blanken, who sued Kentucky Highlands and OVC in this Court. *See Blanken, et al. v. Kentucky Highlands Investment Corporation, et al.*, No. 6:13-47-DLB (E.D. Ky. filed April 22, 2013) (the "Blanken Kentucky action"). With this action, Blanken asserted that he – not LEEP – owned a major piece of equipment repossessed by Kentucky Highlands called the Bradbury Roll Forming Machine and, thus, Kentucky Highlands had wrongfully repossessed it and sold it to OVC. (DE 53-6, Blanken Kentucky Complaint, ¶¶31, 48.)

The third lawsuit was also brought by Blanken, this time in state court in Pennsylvania (the "Blanken Pennsylvania action"). In the Pennsylvania action, Blanken again sued Kentucky Highlands and OVC again asserting that the insureds wrongfully repossessed certain other inventory that belonged to him, not to LEEP. That action was later removed to federal court in Pennsylvania, which transferred the case to this Court. *See Blanken v.*

*Kentucky Highlands Investment Corporation, et al.*, 6:14-cv-202-DLB (E.D. Ky. Removed March 7, 2014).

Kentucky Highlands, OVC, Egnew, and Moncrief were insured by at least one of the defendant insurers in this action: Grange Mutual Casualty Co., Scottsdale Indemnity Company, or Auto-Owners/Owners Insurance Company (together, "Owners").[1] These insurers asserted, however, that the claims brought by LEEP and Blanken against their insureds were not covered under the applicable insurance policies. Grange refused to defend their insureds at all. Owners offered to defend the insureds under a "reservation of rights" and appointed counsel to represent them. Scottsdale did the same, except with regard to Moncrief, who Scottsdale refused to defend at all. (DE 52-1, Mem. at 1.)

The insureds, however, retained their own counsel to represent them. With this action, they seek reimbursement for the amounts they paid to defend themselves in the three lawsuits. They assert a breach of contract claim and seek a declaratory judgment that the insurance companies were obligated to defend them in the underlying actions. They also assert claims for statutory bad faith and common-law bad faith against Scottsdale and Grange.

Each of the insurance company defendants assert a counterclaim in which they ask the Court to declare that they have no duty to reimburse their insureds for the costs incurred in defending the underlying actions. In addition, Owners asks that Kentucky Highlands be required to reimburse it for the costs of defending it in the underlying actions. None of the insurers seek to recover any amounts paid by them to settle the underlying actions. (DE 52-1, Mem. at 2.)

---

[1] The insureds' claims against a fourth insurer, Philadelphia Indemnity Insurance Company, were voluntarily dismissed by the insureds. (DE 39, Order.)

The insureds move for partial summary judgment, asking for judgment in their favor that the insurance companies had a duty to defend them in the underlying actions. Each of the insurance companies also moves for summary judgment, asking the Court to find that they had no duty to defend the plaintiffs.

## II.        Determining the Duty to defend

Kentucky law on the duty to defend is not completely clear. First, is the oft-quoted principle that "[t]he insurer has a duty to defend if there is any allegation which potentially, possibly or might come within the coverage of the policy." *James Graham Brown Found., Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 279 (Ky. 1991). In *James Graham Brown Found.*, the Kentucky Supreme Court clearly states the duty to defend is determined by the "language of the complaint" and not the "merit of the action." *Id*. This means, "Under Kentucky law, a court should determine at the outset of litigation whether an insurance company has a duty to defend its insured by comparing the allegations in the underlying complaint with the terms of the insurance policy." *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 507 (6th Cir.2003).

The insureds argue that a court may go beyond the allegations of the complaint and "inquire into the underlying facts" to determine whether an insurer has a duty to defend. (DE 64, Response/Reply at 3.) In making this argument, the insureds cite to the dissent in an unpublished Kentucky Court of Appeals decision. *Kentucky Sch. Boards Ins. Tr. v. Bd. of Educ. of Woodford Cty.*, No. 2002-CA-001748-MR, 2003 WL 22520018, at *12 (Ky. Ct. App. Nov. 7, 2003) (McAnulty, J., dissenting). The majority ruled that the trial court "did not err in focusing on the *nature of the allegations rather than the underlying facts* as asserted by KSBIT." *Id*. at *7 (emphasis added).

This would seem to indicate that the only matters relevant in determining the duty to defend are the underlying complaint against the insured and the insurance policy. However, another oft-quoted principle is that, under Kentucky law, in addition to the policy and the allegations, the Court may also consider the "known facts." *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). In support of this principle, *Lenning* cites the Kentucky Supreme Court's decision in *James Graham Brown Found.* In a more recent, albeit unpublished, decision, the Sixth Circuit made clear that, under Kentucky law, "the allegations in the complaint do not contain the only relevant facts" in determining the duty to defend. *KSPED LLC v. Virginia Sur. Co.*, 567 F. App'x 377, 383 (6th Cir. 2014). Instead, the Court should also consider the "known facts." *Id*. In *KSPED*, the court clarified that the relevant "known facts" are the facts known to the insurer at the time it declined to defend its insured. *Id*.

In *KSPED*, the issue was the applicability of an exclusion in an insurance policy for liability arising out of the sale of alcoholic beverages if the insured was in the business of selling or serving alcoholic beverages. In determining that the exclusion applied, the Sixth Circuit looked beyond the allegations of the complaint to the facts known to the insurer. The court noted that, at the time it declined to defend its insured, the insurer had copies of the concession agreements between the insured and its concessionaires. *Id*. at 383. Thus, the court could consider the facts established by those agreement in determining whether the insured was in the business of selling alcohol.

There is one more thing that the Court should consider in certain policies: the subjective intent of the insured. This is the holding in *James Graham Brown Found.* – the same case that holds that "[t]he insurance company must defend any suit in which the language of the complaint would bring it within the policy coverage regardless of the merit of the action."

*James Graham Brown Found., Inc.*, 814 S.W.2d at 279. In that case, the policy provided that the insurer would indemnify the insured for "all sums which the insured will become legally obligated to pay as damages because of. . . property damage. . . caused by an occurrence." *Id.* at 275.

The policy defined an "occurrence" as an "accident . . .which result[s] in. . .property damage, *neither expected nor intended from the standpoint of the insured.*" *Id.* (emphasis added). The court held, "Whether an insured intended the consequences of its action is normally a question of fact and not one of law. The determination of whether an insured expected or intended the damage resulting in the claim is for the jury." *Id.* at 276. "Determination of intent is normally inappropriate for summary judgment." *Id.*

Thus, *James Graham Brown Found.* instructs that determining the duty to defend in some cases may stray far from merely looking at the allegations of the complaint against the insured. In a policy providing that damages are covered if they are "neither expected nor intended from the standpoint of the insured," determining whether the insurer has a duty to defend its insured may even require a jury trial.

Later, in *Cincinnati Inc. Co. v. Motorists Mut. Ins. Co.*, 306 S.W.3d 69 (Ky. 2010), the Kentucky Supreme Court made clear that the *James Graham Brown Found.* approach to determining the duty to defend is limited to policies that explicitly reference the "expectations and intentions of the insured." *Id.* at 78 ("Upon reflection, we now recognize the crucial, materially different definition of occurrence in this case renders *James Graham Brown Foundation, Inc.* of, at most, limited value in determining whether there is an 'occurrence' in the case at hand.")

At a conference call in this matter, the insurers requested that the Court permit the parties to brief the threshold issue of whether they had a duty to defend their insureds before

permitting the parties to engage in discovery. The insureds argued that discovery was necessary to determine the "facts known" to the insurers. The Court agreed with the insurers and ordered the parties to brief the "duty to defend" before engaging in discovery. However, the Court advised the parties that, if it was unable to determine the duty to defend based only on the complaints and policies, it would order the parties to engage in discovery.

Thus, in this opinion, the Court will begin by comparing the allegations of the complaint to the policies to determine if there was any duty to defend. The Court will then determine the need for any discovery regarding the facts known to the insurer and the intent of the insureds.

### III. Owners' duty to defend

Owners issued various policies to the plaintiffs. Despite the extensive briefing on these motions, there is some confusion about the very basic issue of which policies the insureds claim provided them coverage. The Court will assume that the insureds claim coverage under the insurance policies attached as exhibits to their motion for summary judgment. There are three such Owners policies: a businessowners policy covering Kentucky Highlands and its officers and directors (DE 52-7) and two "executive umbrella" policies, one of which covered Egnew (52-10) and the other of which covered Moncrief (52-11). Late in their response/reply brief, the insureds seem to confirm that these are the policies they claim covered them. (DE 64, Response/Reply at 23.)

The Kentucky Highlands businessowners policy covered Kentucky Highlands itself and its officers and directors, "but only with respect to their duties as [Kentucky Highland's] officers or directors." (DE 52-7, Policy, § C(1)(c).) According to the complaint, Moncrief was a Kentucky Highlands officer and OVC director during the relevant time period, but Egnew was president of OVC only. (DE 1, Complaint, ¶¶ 3, 4.) The insureds do not dispute this. Thus, the businessowners policy covered only Kentucky Highlands and Moncrief.

### A. The Policy Provisions

Determining the relevant provisions is somewhat confusing here because the policy that the insureds attach to their motion and address in their briefings consists of 14 pages. Meanwhile, Owners attaches 148 pages to its motion/response brief, which it identifies as the "business owners policy." (DE 53-10 to 53-15.) Within those 148 pages, however, are the same 14 pages that the insureds identify as the businessowners policy. (DE 53-11 at CM-ECF pp. 7-20.) Thus, the Court assumes that the 14-page document is the basic businessowners policy.

There are two additional problems with determining the relevant policy provisions. The first problem is with the policy declarations. The insureds attach one page labeled "Businessowners Policy Declarations." (DE 52-7 at CM-ECF p. 1.) Owners attaches six pages labeled "Businessowners Policy Declarations." (DE 53-10 at CM-ECF pp. 2-7;)

The second problem is with the policy "endorsements." The insureds attach none and do not discuss any. Meanwhile, Owners attaches pages and pages of endorsements, including one relevant to this action that will be discussed further below. (DE 53-10 at CM-ECF pp. 8-10; DE 53-11 at CM-ECF p. 25; DE 53-12 at CM-ECF pp. 1-25; 53-13 at CM-ECF pp. 1-25; 53-14 at CM-ECF pp. 1-25; DE 53-15 at CM-ECF pp. 1-14.)

Looking to the basic 14-page policy, in determining coverage, the place to start is naturally with the section titled "coverages." The policy provides coverage for "sums that the Insured becomes legally obligated to pay as damages because of' . . . 'property damage,' "personal injury,' or 'advertising injury' to which this insurance applies." (DE 52-7, Owners KH Policy, § A(1).) Thus, in determining coverage, the policy directs that the Court look at the kinds of damages or injury alleged in the underlying LEEP and Blanken actions.

The policy defines "property damage" as "physical injury to tangible property, including all resulting loss of use of that property" or "loss of use of tangible property that is not physically injured." (DE 52-7, Owners KH Policy, § F(12).)

The policy defines "personal injury" to include "wrongful entry into, or eviction of a person from a room, dwelling, or premises." (DE 52-7, Owners KH Policy, § F(10)(c).)  It is also defined to include "[o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services." (DE 52-7, Owners KH Policy, § F(10)(d).)

As to advertising injury, the policy applies only to such an injury committed "[i]n the course of advertising your goods, products or services." (DE 52-7, Owners KH Policy, § A(1)(a)(3).) It includes injuries arising out of the "oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." (DE 52-7, Owners KH Policy, § F(1)(a).)

These are the relevant coverage provisions. The Court will now look to the allegations of the LEEP and Blanken actions to determine if they allege **"**property damage," "personal injury" or "advertising injury" as those terms are defined in the policies.

**B.  The Allegations in the LEEP and Blanken Complaints**

The LEEP complaint alleged that it manufactures certain insulated panels that have been used by the U.S. Marine Corp. and U.S. Army for the construction of buildings.  (DE 53-3, LEEP Complaint.) It alleged that OVC manufactures various outdoor equipment including military tent systems for the Department of Defense. LEEP alleged that, in 2010, its representatives met with Egnew, CEO of OVC, to discuss a joint venture with the goal of preparing a response to a solicitation from the U.S. Army.

LEEP alleged that the parties entered into a memorandum of understanding, which contained a confidentiality provision. That provision prohibited either party from using the other party's confidential or proprietary information for any purpose except for responding to the Army's solicitation.

Later, LEEP alleged, it and OVC began discussions about creating a new company together to be called Stearns Manufacturing Corporation. The idea was that OVC would contribute cash while LEEP would contribute "know-how." LEEP alleged that, during these negotiations, it provided certain confidential and proprietary information to Egnew and his counsel, including information about LEEP's creditors. One of those creditors was Fortress Credit Corporation. LEEP alleged that it had negotiated a deal by which it would pay Fortress $ 1.2 million to settle all its debt.

At some point, LEEP's president, John Nordstrom, refused to disclose any additional confidential information until the parties signed a non-disclosure agreement. The parties signed that agreement in 2011. OVC again agreed to keep LEEP's confidential and proprietary information "in strict confidence as a fiduciary and not to make any use whatsoever at any time [of] such proprietary and confidential information." (DE 53-3, LEEP Complaint, ¶42.) It also agreed not to contact any of "LEEP's creditors or lenders or customers or suppliers." (DE 53-3, LEEP Complaint, ¶41.)

LEEP alleged that, in August 2012 – after Kentucky Highlands, Moncrief, Egnew, and OVC had obtained all the confidential information that they needed to "circumvent LEEP, strike a better deal with its lender and landlord, and take over LEEP's business" – Egnew informed Nordstrom that the deal was off. Then, in December 2012, Kentucky Highlands informed LEEP that it had purchased Fortress's rights in its financing agreements with LEEP, that LEEP was in default under those agreements, and that Kentucky Highlands intended to take immediate possession of all of LEEP's property.

LEEP alleged that these events prove that, from early 2012 through December 26, 2012, "the Defendants conspired, planned, organized, and schemed, to force LEEP out of business and to take over LEEP's business by virtue of obtaining LEEP's confidential information and then purchasing the Fortress note." (DE 53-3, LEEP Complaint, ¶94.) LEEP explained that

Nordstrom told "the Defendants" about his negotiations with Fortress and then "the Defendants . . . used that confidential information to approach Fortress to obtain an assignment of the Note for only $750,000 and then give notice of default to LEEP, demand over $7 million dollars to be paid immediately, take possession of former LEEP facility . . . and wrongfully repossess all LEEP assets." (DE 53-3, LEEP Complaint, ¶95.)

LEEP asserted that Kentucky Highlands "wrongfully entered" LEEP's landlord's premises and took insulated panels and equipment, including a particular piece of equipment called the Bradbury Roll Forming machine, which is used in the manufacturing of the panels. LEEP alleged that Kentucky Highlands, using the confidential and proprietary information, also "wrongfully hired away" LEEP's key employees, took over LEEP's business and contacted LEEP's customers, "all in an effort to destroy LEEP and to take over LEEP's business through unlawful means." (DE 53-3, LEEP Complaint, ¶97.)

LEEP asserted claims for breach of contract, fraud, tortious interference with various contracts and with prospective business, breach of fiduciary duty, defamation, conversion, violations of RICO, and of the Kentucky Uniform Trade Secrets Act (KUTSA) and aiding and abetting the breach of a fiduciary duty. (DE 53-3, 53-4, 53-8, LEEP Complaints.)

LEEP alleged that the defendants engaged in "intentional conduct" entitling it to punitive damages. LEEP alleged that the defendants "maliciously breached" their confidentiality agreements "with the intent to cause financial and economic damage and injury to LEEP." (DE 53-4, LEEP Complaint, ¶ 164.)

As to the Blanken actions, in the Kentucky action, Blanken alleged that he, not LEEP, owned the Bradbury Roll Forming Machine, valued at $750,000, and that he had leased the equipment to LEEP. He further alleged that, after Fortress assigned its rights under its financing agreement with LEEP to Kentucky Highlands, he learned that Kentucky Highlands intended to seize the Bradbury Roll Forming Machine. He alleged that he and

LEEP both notified Kentucky Highlands that he was the sole owner of the machine and directed Kentucky Highlands not to seize the machine. Blanken alleged that Kentucky Highlands nonetheless seized the machine and removed it from LEEP's facility. Blanken alleged that Kentucky Highlands then sold the machine to OVC, who wrongfully possessed it.

Blanken asserted claims against Kentucky Highlands and OVC for tortious interference with a contract and conversion. Blanken alleged that OVC and Kentucky Highlands engaged in "intentional conduct," entitling him to punitive damages. He alleged that these insureds seized the machine knowing it belonged to Blanken "with the intent to cause financial and economic damage and injury to Blanken." (DE 53-6, Blanken Kentucky Action, ¶¶ 88, 92.)

As to the Blanken Pennsylvania action, Blanken again sued Kentucky Highlands and OVC, with allegations similar to the Kentucky action. This time he alleged that Kentucky Highlands and OVC wrongfully seized certain additional inventory, despite knowing that they had no right to it. Blanken asserted that he is the owner of the seized inventory. Blanken asserted a conversion claim against Kentucky Highlands and a claim for replevin against Kentucky Highlands and OVC. He alleged that the actions by Kentucky Highlands and OVC were "extreme and outrageous and demonstrated their intentional, willful, wanton and/or reckless disregard of the rights of others," and, thus, entitled him to punitive damages. (DE 78-3, Pennsylvania action, ¶ 49.)

### C. Coverage of Kentucky Highlands and Moncrief under the Owners businessowners policy

Owners had no duty to defend Kentucky Highlands or Moncrief under the businessowners policy.

The LEEP action does allege that the insureds caused it to suffer "property damage" as that term is defined under the policy. LEEP alleged that it had a contract with a company

called Salzer GmbH to construct buildings but that it was not able to perform under that contract because the insureds wrongfully seized LEEP's assets. LEEP alleged that, pursuant to a contract, Blanken had permitted it to use the Bradbury Roll Forming Machine owned by Blanken but that the defendants wrongfully seized that equipment, prohibiting LEEP from using it. LEEP also alleged that it had a business relationship or expectancy with the U.S. government for the construction of anti-terroristic buildings but that the insureds interfered with that relationship by improperly seizing equipment that LEEP had the right to use. Likewise, LEEP alleged that Kentucky Highlands seized LEEP's insulated panels, damaging LEEP in its business because the panels were not available for LEEP's use.

Thus, LEEP alleged that the insureds caused it to suffer the "loss of use of tangible property," which is "property damage" for purposes of the Owners policy.

The policy applies only to property damage, however, "[t]hat is caused by an 'occurrence.'" (DE 52-7, Owners KH Policy, § A(1)(a)(1)(b).) An "occurrence" is defined as "an accident." (DE 52-7, Owners KH Policy, §F(9).) The term "accident" is not defined in the policy. In *Cincinnati Ins. Co.*, however, the Supreme Court of Kentucky held that, "[i]nherent in the plain meaning of 'accident' is the doctrine of fortuity." *Cincinnati Ins. Co.*, 306 S.W.3d at 74. The doctrine of fortuity, in turn "consists of two central aspects": intent and control. *Id.* As to intent, "a loss or harm is not fortuitous if the loss or harm is caused intentionally by the insured." *Id.* (brackets omitted). As to control, an accident for purposes of insurance law is a "'chance event" that is "beyond the control of the insured." *Id.* at 76. An insured has no "control" over an event if it is beyond its power to cause or is within the control of third persons. *Id.* at 76.

In *Cincinnati Ins. Co.*, the Kentucky Supreme Court determined that a claim against a homebuilder for faulty construction was not caused by an "occurrence," or accident. *Id.* at 71. The Court of Appeals had determined that the damage was caused by an occurrence because

the homebuilder did not intend the damage and, thus, the damage was "undoubtedly accidental." *Id*. at 72. The Kentucky Supreme Court agreed that it was "highly unlikely" that the homeowner "subjectively intended" to build a substandard house. *Id*. at 74. But the court determined that the analysis should not end there. Instead, the court must also look at whether the homebuilder had control over the building of the home. *Id*. at 76. Because the homeowner clearly had control over the construction of the house, its substandard construction of the home could not have been "a fortuitous, truly accidental, event." *Id*.

The kind of property damage that LEEP alleged it suffered was the loss of use of its assets. LEEP did not allege that this loss was caused by an "accident." In fact, LEEP did not allege any "accidental" conduct on the part of the insured. It alleged that each and every action taken by the insureds was part of a planned, deliberate and organized scheme "to force LEEP out of business and to take over LEEP's business." (DE 53-3, LEEP Complaint, ¶94.)

LEEP alleged that the loss of use of its assets was caused by Kentucky Highland's intentional actions of "obtaining LEEP's confidential information and then purchasing the Fortress note." (DE 53-3, LEEP Complaint ¶ 94.) According to LEEP, the insureds "used that confidential information to approach Fortress to obtain an assignment of the Note for only $750,000 and then give notice of default to LEEP, demand over $7 million dollars to be paid immediately, take possession of former LEEP facility without any legal foreclosure action and wrongfully possess all LEEP assets." (DE 53-3, LEEP Complaint ¶ 95.) Further, the actions alleged were completely within Kentucky Highland's control. Thus, LEEP did not allege "property damage" for purposes of the policy because it did not allege that the damage was caused by an "occurrence," or "accident."

As for any alleged "personal injury," the policy defines personal injury to include "wrongful entry into, or eviction of a person from, a room, dwelling, or premises that the person occupies." (DE 52-7, KH Policy, §F(10(c).) LEEP alleged that the insureds wrongfully

entered its landlord's premises and wrongfully locked LEEP out of LEEP's building in Somerset, Kentucky. This is "personal injury" under the policy.

Unlike "property damage," "personal injury" is covered regardless of whether it was caused by an occurrence/accident. (DE 52-7, KH Policy, §A(1)(a).) And there is no applicable exclusion. (DE 52-7, KH Policy, §B(1)(p).)

The problem, however, is that one of the endorsements that Owners attaches to its motion provides that personal injury coverage under the businessowners policy is "deleted" unless that coverage is "indicated in the Declarations . . . ." (DE 53-14 at CM-ECF p. 11.) "[W]hen a court construes an insurance policy, it considers the policy's meaning in light of all riders and endorsements attached to it, and when a conflict arises between an endorsement and another policy provision, the endorsement controls." 16 Williston on Contracts § 49:23 (4th ed.)

As to whether personal injury coverage is "indicated in the Declarations" as the endorsement requires, while Owners and the insureds attach totally different declarations pages to their motions, both sets of declarations state that personal injury coverage is "excluded." (DE 52-7, Policy at CM-ECF p. 1; DE 53-10, Policy at CM-ECF p. 2.)

The term "excluded" is not ambiguous. "The contents of a declarations sheet, or the declarations page, of an insurance policy is regarded as part of the insurance contract." 16 Williston on Contracts § 49:25. Further, because the declarations page "is the one page of the policy likely to be read by the insured, and contains the terms most likely to have been requested by the insured," it is "held to define the coverage afforded the insured and to control over more restrictive terms contained in the body of the policy." *Id*.

As unambiguously expressed in the declarations page of the Owners businessowners policy, personal-injury coverage is excluded.

As to "advertising injury," LEEP alleged that defendant Egnew defamed it. It does not make this same allegation against Kentucky Highlands or Moncrief. Again, Egnew is not insured under the businessowners policy.

Thus, looking only to the allegations of the complaint, the businessowners policy did not provide coverage for any of the damages claimed by LEEP. Owners had no duty to defend Kentucky Highlands, Moncrief or Egnew in that action.

The outcome is the same regarding Owners' duty to defend Kentucky Highlands in the Blanken actions. With both actions, Blanken alleged that Kentucky Highlands took assets belonging to him, depriving him of the use of those assets. He did not assert any claims against Moncrief or Egnew in either action.

As discussed, Blanken's allegation that Kentucky Highlands deprived him of the use of his assets is "property damage" under the businessowners policy. The next issue is whether Blanken alleged that the property damage was caused by an "occurrence" as the policy requires, meaning that the insureds acted with the intent to cause the alleged property damage and that they had control over the alleged acts leading to the damage.

In both actions, Blanken alleged Kentucky Highlands was notified that the equipment at issue was not owned by LEEP, the sole debtor under the Fortress financing agreement. Thus, Blanken alleged that Kentucky Highlands intended the property damage alleged – loss of use of the assets – and that it had control over the actions leading to that damage. For this reason, the property damage alleged by Blanken was not covered under the businessowner policy.

**D. Coverage of Moncrief and Egnew under the executive umbrella policies.**

Moncrief and Egnew also claim coverage under the executive umbrella policies attached to their motion for summary judgment. (DE 52-10, 52-11, Executive Umbrella Policies.) Those policies provide that Owners will pay on behalf of the insured "the ultimate net loss in excess of the retained limit which the insured becomes legally obligated to pay as damages because

of personal injury or property damage. . ." (DE 52-10, Executive Policy at 3.) "Personal injury" is defined to include "wrongful eviction" and "libel, slander, defamation of character." (DE 52-10, Executive Policy at 2.) Property damage is defined as "injury to or destruction of tangible property. It includes the loss of use of such property." (DE 52-10, Executive Policy at 2.)

Thus, in determining the duty to defend, the Court must look to the kinds of injuries and damages that LEEP alleged. Again, Blanken did not assert any claims against Egnew or Moncrief.

As discussed, LEEP alleged that all the insureds wrongfully entered LEEP's place of business and took its assets, depriving LEEP of the use of the assets. This is an allegation of "property damage" under the executive umbrella policies.

LEEP further alleged that the insureds locked LEEP out of its premises to destroy LEEP's business and use its confidential information. (DE 53-3, Complaint ¶98.) It alleged that Egnew slandered LEEP to a defense contractor and a German purchaser. (DE 53-3, Complaint ¶159.) These are allegations of "personal injury" under the executive umbrella policies.

Unlike the businessowners policy, the executive umbrella policies cover these injuries regardless of whether they were caused by an occurrence/accident. But the policies do exclude "personal injury or property damage expected or intended by the insured." (DE 52-10, Executive Policy at 4.)

As discussed, LEEP's complaint alleges that the insureds intended to cause the property damage and personal injury at issue. LEEP alleged a planned, deliberate scheme to destroy it and take over its business, assets, and customers. It alleged that every action that the insureds took was part of that scheme. Accordingly, looking only to the allegations of the complaint, the damages alleged against Moncrief and Egnew are excluded from coverage under the executive umbrella policies.

## IV. Grange's Duty to Defend

Grange issued a commercial policy covering OVC and its executive officers and directors, "but only with respect to their duties as [OVC's] officers and directors." (DE 52-8, Grange Policy, §II(1)d).) This would include Egnew (OVC's president) and Moncrief (an OVC director).

Under the coverage provision of the policy, Grange – like Owners in its businessowners policy – agreed to pay the sums that its insureds become "legally obligated to pay as damages because of . . . 'property damage'" or "personal and advertising injury." (DE 52-8, Grange Policy, §I, Coverage A (1)(a), Coverage B(1)(a).)

Also like Owners, Grange agreed to pay only property damage caused by an "occurrence." (DE 52-8, Grange Policy, §I(1)(b)(1)). The Grange policy also defines property damage to include "[l]oss of use of tangible property. . . ." (DE 52-8, Grange Policy, §V(17)). Occurrence is again defined as an "accident." (DE 52-8, Grange Policy, §V(13)).

For the reasons discussed with regard to the Owners businessowners policy, while LEEP and Blanken alleged that the insureds intentionally seized assets, depriving LEEP and Blanken of their use, they did not allege that the damage was caused by an accident. Instead, they alleged the insureds intended to deprive them of the loss of use of their assets and that the actions causing the alleged damages were completely within the insureds' control. Thus, looking only to the allegations of the complaints, neither LEEP nor Blanken alleged that the insureds were liable for "property damage" for purposes of the policy because neither alleged that the damage was caused by an "occurrence," or "accident."

As to "personal and advertising injury," the Grange policy defines this to include the "wrongful eviction from" or "wrongful entry into" a "room, dwelling or premises." (DE 52-8, Grange Policy, §V(14)(c).) It also includes the "oral or written publication. . . of material that

slanders or libels a person or organization or disparages a person's or organization's goods, products or services." (DE 52-8, Grange Policy, §V(14)(d).)

As discussed, LEEP alleged that the insureds wrongfully entered its landlord's premises and wrongfully locked LEEP out of LEEP's building in Somerset, Kentucky. This is "personal and advertising injury" under the policy. LEEP also alleged that Egnew slandered LEEP to one of its customers and a defense contractor. This is also "personal and advertising injury" under the policy.

Nevertheless, the Grange policy excludes personal and advertising injury "caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" (DE 52-8, Grange Policy, Coverage B, §2(a)). Again, LEEP alleged only intentional conduct by the insureds and alleged that every action they took, from wrongfully entering LEEP's premises to contacting LEEP's customers, was part of a planned and deliberate scheme to "destroy LEEP and take over LEEP's business through unlawful means." (DE 53-3, LEEP Complaint, ¶¶ 94-97.)

Accordingly, looking only to the allegations of the complaint, the personal injury alleged by LEEP is not covered under the Grange policy.

The Blanken complaints are asserted against OVC only and do not allege any personal or advertising injury under the Grange policy.

Accordingly, neither the LEEP nor the Blanken complaints against the insureds allege property damage or personal injury covered under the Grange policy.

## V.      Scottsdale's Duty to Defend

Like Grange, Scottsdale also insured OVC and its officers and directors, including Moncrief (an OVC director) and Egnew (President of OVC.) (DE 52-9, Scottsdale Policy, §B(5).)

The Scottsdale policy provides that it must pay the "loss" that its insureds become legally obligated to pay because of a "claim" made for any "Wrongful Act." (DE 52-9, Scottsdale Policy, § A.) "Loss" includes damages, judgments, settlements and "costs, charges and expenses" incurred by the insureds. (DE 52-9, Scottsdale Policy, § B(7).) Thus, while Owners and Grange required the Court to look at the kind of "damages" or "injury" alleged by LEEP and Blanken, the Scottsdale policy requires the Court to focus on the kinds of "claims" asserted against the insureds. If the underlying actions assert a claim for a "wrongful act," then Scottsdale has a duty to defend its insureds, barring any applicable exclusion.

A "wrongful act" is defined as "any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by . . . any of the Directors and Officers. . . and the Company." (DE 52-9, Scottsdale Policy, § B(9).)

Scottsdale argues that it was not obligated to defend OVC or Egnew in the three underlying actions because a "wrongful act" does not include intentional acts. Instead, it includes only negligent acts.

In support of its argument, Scottsdale cites *Matthew T. Szura & Co. v. Gen. Ins. Co. of Am.*, 543 F. App'x 538, 542 (6th Cir. 2013). In that case, also, the insurance company was required to defend the insured again claims made for "wrongful acts." *Id.* at 542. Interpreting Michigan law, the court determined that a "wrongful act" under the policy at issue included only "negligent conduct." *Id*. This was because the policy defined a "wrongful act" as "any actual or alleged negligent act, error or omission, Personal Injury, or Advertising Injury." *Id*. at 541. The court noted that "courts around the nation are in general agreement that a policy covering 'negligent acts, errors or omissions' does not cover intentionally wrongful conduct." *Id*. at 543.

Here, however, the policy does not define wrongful acts as only "negligent acts, errors or omissions." Instead, the policy defines a wrongful act as "any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or *act* allegedly committed or attempted by" OVC, its directors, or officers. (DE 52-9, Scottsdale Policy §B(9) (emphasis added). Thus, under its plain language, the Scottsdale policy covers losses caused by any claim for *any act* committed by OVC or its officers and directors, including intentional ones.

Thus, looking to the allegations of the LEEP and Blanken complaints, LEEP and Blanken asserted claims that fall within the coverage provisions of the Scottsdale policy.

The next issue is whether there are any applicable exclusions. The Scottsdale policy excludes loss on account of any claim for actual or alleged damage to tangible property including the loss of use of the property. (DE 52-9, Scottsdale Policy §C(1)(a).) Scottsdale does not argue, however, that this exclusion is applicable to any claim asserted in the underlying complaints. Accordingly, the Court will not address it.

Scottsdale does argue, however, that another exclusion is applicable. That exclusion provides that Scottsdale is not liable for "[l]oss on account of any Claim. . . alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged breach of any contract or agreement; except and to the extent the Company would have been liable in the absence of such contract or agreement." (DE 52-9, Scottsdale Policy, § C(2)(a)).

Though Scottsdale argues this exclusion applies to all insureds, by its plain language, it applies only to claims against OVC, not to claims against OVC's officers and directors. (DE 52-9, Scottsdale Policy §C(2) ("Exclusions Applicable Only to Insuring Clause A.3.")) As to OVC, however, this exclusion is very broad.

Under Kentucky law, just the phrase "arising out of" is to be "construed expansively." *Capitol Specialty Ins. v. Indus. Elecs., LLC*, 407 F. App'x 47, 50 (6th Cir. 2011) (quoting *Hugenberg v. West American Insurance Company/Ohio Casualty Group*, 249 S.W.3d 174, 186 (Ky.App.2006)). In *Hugenberg*, the Kentucky Court of Appeals determined that, where a policy excludes damages "arising out" an action, "[a]ll that is required is some "[causal] connection" between the damages and the action. *Hugenberg*, 249 S.W.3d at 186. "'[A]rising out of' is ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of' or 'flowing from' or in short, 'incident to or having a connection with.'" *Capitol Specialty, Ins.*, 407 F. App'x at 50-51 (quoting *Assurance Co. of Am. v. J.P. Structures, Inc.*, Nos. 95–2384, 96–1010, 96–1027, 1997 WL 764498, at *5 (6th Cir. Dec. 3, 1997)).

The Scottsdale policy does not just exclude loss on account of any claim "arising out of" the actual or alleged breach of contract, but more broadly excludes loss on account of any claim "alleging, based upon, . . . attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged breach of any contract or agreement. . . ." (DE 52-9, Scottsdale Policy, § C(2)(a)).

As to the LEEP action, this obviously would exclude coverage for the breach of contract claims, which allege that OVC agreed in writing and orally not to use LEEP's confidential information for any purpose other than for the establishment of a joint enterprise between LEEP and OVC. (DE 53-3, LEEP Complaint, Counts I, II.) This would also exclude coverage for the fraud claim, which is also based upon the insureds' promise that they would not use LEEP's confidential information for purposes "other than to determine the details of the LEEP/OVC joint venture." (DE 53-3, LEEP Complaint, Count III.)

In fact, this broad exclusion for any claim alleging, based upon, attributable to, *directly or indirectly resulting from*, in consequence of, *or in any way involving* the actual or alleged

breach of any contract, would exclude all claims against OVC in the LEEP complaint except for the tortious interference claims in Count VIII and XIII.

The tortious interference claim in Count IV is based upon the insureds' use of LEEP's confidential information to purchase the financing agreement that authorized the seizure of LEEP's assets "in violation of the Non-Circumvention Agreement with LEEP." (DE 53-4, LEEP Complaint, ¶ 123.) The tortious interference claims in Count V and IX are based upon the insureds' improper seizure of LEEP's assets and its promise that LEEP's confidential information "would not be used" and that the insureds "would not disclose nor circumvent LEEP in dealing with its lender and with its prospective customers." (DE 53-4, LEEP Complaint, ¶ 150). Likewise, the conversion claim (DE 53-4, LEEP Complaint, Count VI) is based on the insured's alleged wrongful use of LEEP's confidential information to seize LEEP's assets.

The breach of fiduciary duty claim (Count X) is based on the alleged "special relationship" that existed between LEEP and the insureds "by virtue of LEEP sharing confidential and proprietary information" with the insureds "for the purpose of forming a partnership." (DE 53-4, LEEP Complaint, ¶ 154.) LEEP alleged that "OVC agreed to hold LEEP's proprietary information in strict confidence as a fiduciary." (DE 53-4, LEEP Complaint, ¶42.)

Likewise, the claims for injunctive relief (Count XIV) and claims under RICO (Count XVI) and the Kentucky Uniform Trade Secrets Act (Count XVII) are based on the insureds' alleged wrongful scheme to use LEEP's confidential information to seize LEEP's assets and facilities and take over LEEP's business.

All of these claims at least "indirectly result[ed] from" or "in *any* way involve[ed]" the "actual or alleged" breach of the agreements between the parties that LEEP's confidential

and proprietary information would only be used only for the establishment of the joint venture and that the insureds would not approach LEEP's customers or lenders.

The insureds point out that this exclusion does not apply "to the extent [the insureds] would have been liable in the absence of such contract or agreement." (DE 52-9, Scottsdale Policy, §C(2)(a).) But for each of these claims, LEEP asserts that the insureds' actions were wrongful because they allegedly used LEEP's confidential and proprietary information for purposes other than the establishment of a joint venture. And LEEP alleged that the insureds' use of the information in this way was wrongful because it violated the confidentiality agreement between the parties.

LEEP alleged that the insureds seized its assets and its facilities pursuant to the Fortress financing agreement. It did not allege that the insureds' actions were wrongful because the financing agreement was invalid. LEEP alleged that the insureds' seizure of its assets was wrongful because the insureds violated the confidentiality agreement in order to purchase the financing agreement. Without the violation of the agreement to not use LEEP's confidential information to purchase the financing agreement, OVC would have no liability on the claims discussed.

Accordingly, all of LEEP's claims against OVC are excluded from coverage under this provision except for the tortious interference claims in Count VIII and XIII of the complaint. The claims in Count VIII and XIII allege that the insureds' actions were wrongful, not because they were in violation of any agreement, but because the insureds' seized equipment pursuant to the financing agreement that did not belong to LEEP.

The request for a declaration of rights contained in Count VII of the complaint is asserted against Kentucky Highlands only and, thus, is not covered under the Scottsdale policy. The defamation claim in Count XI is asserted only against Egnew.

The breach-of-contract exclusion would also not apply to any of Blanken's claims against OVC. Blanken does not assert that OVC acted wrongfully because it violated any agreement between the parties. In both Blanken actions, he asserts that OVC acted wrongfully because it seized his assets pursuant to the financing agreement, knowing that LEEP did not own the assets. These claims would exist even if there were no agreement between OVC and the insureds.

Alternatively, Scottsdale argues that the claims are barred by the so-called "joint-venture exclusion." (DE 56-2, Mem. at 10.) That exclusion provides that Scottsdale is not liable for loss on account of any claim "brought or maintained by, on behalf of, in the right of, or at the direction of . . . any person or entity that is an owner of or joint venture participant in any Subsidiary in any respect. . . ." (DE 52-9, Scottsdale Policy, § C(1)(e).) The term "Subsidiary" is bold and capitalized in the policy indicating that it is a defined term, and Scottsdale sets forth a definition of the term in its memorandum. (DE 56-2, Mem. at 10.) Scottsdale does not provide a citation as to where this definition is found in the policy. The policy attached to the insureds' motion for summary judgment contains no such definition. Neither does the policy attached to Scottsdale's motion/response (DE 56-3, Scottsdale Policy.)

The provision would appear to exclude coverage of any claim brought by a joint-venture participant in any OVC subsidiary. Scottsdale argues that, looking to the allegations of the LEEP complaint, LEEP was a joint-venture participant in Stearns, which was a subsidiary of OVC.

The LEEP complaint alleges that it and OVC discussed creating a new company together to be called Stearns Manufacturing Corporation, which would manufacture insulated panels. (DE 53-3, LEEP Complaint, ¶¶ 35, 45, 50.) LEEP alleged that Stearns would be 50 percent owned by OVC and 50 percent owned by LEEP. (DE 53-3, LEEP

Complaint, ¶82.) Nevertheless, LEEP alleges that, on August 17, 2012, Egnew sent a message to Nordstrom of LEEP stating that the deal was off because the parties could not find "common grounds." (DE 53-3, LEEP Complaint, ¶87.) The complaint alleges that Stearns was organized on January 18, 2013.  (DE 53-3, LEEP Complaint, ¶ 17.) But it does not allege that LEEP had any ownership in Stearns. Accordingly, the joint venture-exclusion does not apply to the claims asserted by LEEP.

Finally, Scottsdale argues that it has no duty to defend OVC, Egnew or Moncrief because of the policy's "other insurance" clause. That clause provides that if any loss is covered under another insurance policy, then the Scottsdale policy covers the loss "only to the extent that the amount of the Loss is in excess of the amount of such other insurance. . . unless such other insurance is written only as specific excess insurance over the Limit of Liability for this Coverage Section." (DE 56-3, Scottsdale Policy, § G.) This is true whether the "other insurance" is "stated to be primary, contributory, excess, contingent, or otherwise." (DE 56-3, Scottsdale Policy, § G.)

Scottsdale argues that the Owners businessowners policy covers any losses incurred by OVC, Egnew and Moncrief. It relies only on the businessowners policy for this argument. It does not mention the Owners executive umbrella policies covering Egnew and Moncrief. (DE 56-2, Mem. at 13-14.)

Neither OVC nor Egnew, however, was insured under the Owners businessowners policy. That policy insured only Kentucky Highlands and Moncrief, in his capacity as an officer of Kentucky Highlands. Thus, the "other insurance" exclusion in the Scottsdale policy does not exclude coverage for claims against OVC or Egnew. Nor does it exclude coverage for claims against Moncrief, acting in his capacity as a director of OVC.

Further, as to the LEEP claims against Moncrief, the Court has determined that none of these claims is covered under the Owners businessowners policy. Accordingly, the "other

exclusion" provision of the Scottdale policy does not exclude coverage for LEEP's claims against Moncrief.

As to Moncrief in particular, Scottsdale argues it had no duty to defend him because the claims against him in the LEEP action were unrelated to his role as a director of OVC. Moncrief was an "insured" under the policy. The policy defines the "Insured" as the "Company and the Directors and Officers." (DE 52-9, Scottsdale Policy, §B(5).) Moncrief is a director of OVC. As discussed, the policy provides coverage only for losses incurred "by reason of a Claim . . . for any Wrongful Act." (DE 52-9, Scottsdale Policy, §(A)(1).) Wrongful Act, in turn, is defined as certain acts committed by the officers and directors, "while acting in their capacity as such." (DE 52-9, Scottsdale Policy, §B(9).) Scottsdale argues that the LEEP action alleged that Moncrief was acting in his capacity as an officer of Kentucky Highlands – not OVC – with respect to its claims.

The LEEP complaint describes Moncrief as the Vice President of Kentucky Highlands but also as a director of OVC. (DE 53-3, LEEP Complaint, ¶ 13.) It is true, as Scottsdale points out, that at times LEEP describes Moncrief as affiliated with Kentucky Highlands. But LEEP alleges that Moncrief took various actions and it does not always clarify whether he was acting on behalf of Kentucky Highlands or OVC at the time. Exclusions in an insurance policy contract should be strictly construed "to make insurance effective." *Kentucky Farm Bureau Mut. Ins. Co. v. McKinney*, 831 S.W.2d 164, 166 (Ky. 1992). Given that Moncrief was affiliated with OVC and Kentucky Highlands and given the ambiguities in the LEEP complaint regarding which of the two entities he was representing for the various actions alleged, this exclusion does not exclude coverage of claims against Moncrief.

## VI.    Need for Discovery

Thus far, in determining each insurer's duty to defend its insureds, the Court has considered only the allegations of the LEEP and Blanken complaints. This is in keeping with

the Court's conference call at which it was determined that the Court would first rule on the threshold issue of whether any insurers had a duty to defend and that it would make that ruling without permitting discovery. The Court advised the parties, however, that it would order discovery if it found it necessary and appropriate to determine the duty to defend.

Looking only to the allegations of the LEEP and Blanken complaints, the Court has determined the following:

**A. Owners had no duty to defend under the businessowners policy because:**

- The Owners businessowner policy insured only Kentucky Highlands and Moncrief.
- LEEP alleged "property damage" for purposes of the policy but it did not allege that the property damage was caused by an "occurrence."
- LEEP alleged "personal injury" for purposes of the policy but, pursuant to an endorsement and the declarations, the policy does not cover personal injury.
- Blanken alleged "property damage" against Kentucky Highlands for purposes of the policy but he did not allege that the damage was caused by an "occurrence."
- Neither Blanken nor LEEP alleged "advertising injury" against Kentucky Highlands or Moncrief.


**B. Owners had no duty to defend Moncrief or Egnew under the Executive Umbrella Policies because:**

- LEEP alleged property damage and personal injury for purposes of the policies but both were excluded under the exclusion for "personal injury or property damage expected or intended by the insured."

**C. Grange had no duty to defend OVC, Moncrief, or Egnew because:**

- Grange insured OVC and Moncrief and Egnew.
- LEEP and Blanken alleged property damage against the insureds but did not allege that the damage was caused by an "occurrence."
- LEEP alleged personal injury against the insureds but this injury was excluded from coverage because LEEP alleged that the insureds knew their alleged acts would violate LEEP's rights and would inflict the alleged injury.
- Blanken did not allege personal injury against OVC and alleged no claims against Moncrief or Egnew.

**D. Scottsdale had a duty to defend OVC only on the claims of tortious interference contained in Counts VIII and XIII of the LEEP complaint and also had a duty to defend Moncrief and Egnew from all claims in that action because:**

- Scottsdale insured OVC, Moncrief, and Egnew.
- LEEP asserted that the insureds were legally obligated to pay loss by reason of claims for wrongful acts.
- All of LEEP's claims against OVC except for Counts VIII and XIII are excluded from coverage because they all arose out of, were at least indirectly resulting from or in some way involved the actual or alleged breach of agreements with LEEP.
- This exclusion does not apply to the claims against Moncrief or Egnew.

**E. Scottsdale has a duty to defend OVC in the Blanken actions because:**

- Blanken asserted that OVC was legally obligated to pay loss by reason of claims for wrongful acts.

As discussed above, however, in addition to the allegations of the complaints, the Court may also consider the "facts known" to the insurer at the time it declined coverage for its insured and the "intent" of the insured where a relevant policy provision references the insured's intent. The issue is whether discovery into these areas would produce any information relevant to determining any insurer's duty to defend in this case.

There is no reason for discovery in this case into the "facts known" to the insurers. The insureds argue that they did not intend "to violate any legitimate rights of LEEP." (DE 52-1, Mem. at 17.) To the extent this means that the insureds deny they undertook any of the actions alleged in the complaint, the insureds' denials are not "facts" known to the insurer. *See Nationwide Mut. Ins. Co. v. Gum Tree Prop. Mgmt., L.L.C.*, 597 F. App'x 241, 245 (5th Cir. 2015). "A contrary conclusion would allow an insured to 'trigger the duty to defend merely by denying the allegations in the complaint.'" *Id.* (quoting *Am. States Ins. Co. v. Natchez Steam Laundry*, 131 F.3d 551, 553 (5th Cir.1998)). The same is true to the extent that the insureds deny they intended to cause the damage alleged. The denial of intent is not "fact." It is only an assertion. *Am. States Ins. Co.*, 131 F.3d at 553.

The next issue is whether there is a need for any discovery into the subjective intent of the insureds. Again, pursuant to *James Graham Brown Found.*, the subjective intent of the insured is relevant where a policy provision references the insurers' subjective intent. Otherwise, the allegations of the complaint control.

There are only two provisions that reference the subjective expectations or intentions of the insured that the Court has relied on in determining the duty to defend. First, is the exclusion in the Owners executive umbrella policies for "personal injury or property damage expected or intended by the insured." (DE 52-11, Umbrella Policy, Exclusion (d).) This exclusion is related to LEEP's claims against Moncrief and Egnew.

Second, is the exclusion in the Grange policy for personal injury or advertising injury that is "caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'" (DE 52-8, Grange Policy, Coverage B, §2(a)). This exclusion is related to LEEP's claims against OVC, Moncrief, and Egnew for personal and advertising injury.

Again, LEEP did not allege that the insureds took any actions or caused any injury by accident. It alleged that the insureds intentionally orchestrated a scheme "to force LEEP out of business and to take over LEEP's business by virtue of obtaining LEEP's confidential information and then purchasing the Fortress Note." (DE 53-3, LEEP Complaint, ¶ 94.) LEEP alleged that the insureds used the confidential information to buy the note, declare LEEP in default, take LEEP's assets, take possession of LEEP's facility, and contact LEEP's customers "all in an effort to destroy LEEP and to take over LEEP's business through unlawful means." (DE 53-3, LEEP Complaint, ¶¶ 94-97.)

Assuming that the insureds undertook the actions alleged in the LEEP complaint, they necessarily intended the alleged injury: depriving LEEP of the use of its assets, locking LEEP out of its premises, and defamation. Accordingly, no discovery into the insureds' subjective

intent is necessary. Whether the insureds actually took the actions alleged and whether any actions or the results of their actions were actually wrongful goes to the merits of the complaint and is irrelevant in determining coverage. *James Graham Brown Found., Inc.*, 814 S.W.2d at 279.

The insurers cite *Standard Const. Co. v. Maryland Cas. Co.*, 359 F.3d 846 (6th Cir. 2004) In that case, the insured's subcontractor dumped construction debris onto a homeowner's land, believing that it had a signed release from the homeowner permitting it to do so. The homeowner asserted a trespass claim against the insured and the question was whether the damages from the trespass were caused by an "accident."

Interpreting Tennessee law, the Sixth Circuit held that the dumping was an "accident." The Court reasoned that, "while the dumping was intentional, the fact that it was done without permission, thus making it wrongful was not intended by the insured." *Standard Const. Co.*, 359 F.3d at 850. The insureds argue that this case stands for the proposition that "an intentional act undertaken with a mistaken belief that it was authorized can be an accident." (DE 52-1, Mem. at 19.)

As will be explained further below, *Standard Const. Co.* is contrary to Kentucky law. Regardless, the case would not call for discovery into the insureds' intent in this case. LEEP did not allege that the seizure of its assets was wrongful because it was not "authorized." LEEP alleged that the insureds' seizure of its assets was wrongful because the insureds seized the assets by obtaining LEEP's confidential information and by using that information to purchase the Fortress note, all in violation of the agreement between the parties that restricted the use of the information and prohibited contact with LEEP customers and lenders. (DE 53-3, LEEP Complaint¶¶ 94-96.)

LEEP did not allege that the insureds did not have authority to seize the assets under the financing agreement. It alleged that they did not have authority to purchase the financing

agreement because they did so by violating the terms of the agreement between the parties. Whether the insureds' purchase of the Fortress note and subsequent actions actually breached the agreement between the parties goes to the merits of the LEEP action and, as discussed, is irrelevant in determining coverage.

Further, *Standard Constr. Co.* was decided under Tennessee law. In that case, like the Grange and Owners policies, the policy's coverage provision included property damage caused by an occurrence. Also like the policy at issue here, the policy defined occurrence as an "accident." In determining whether the property damage was caused by an occurrence, the court applied Tennessee law and focused solely on the insurer's intent. This is contrary to Kentucky law. As discussed, pursuant to *Cincinnati Ins. Co.*, Kentucky law also requires consideration of whether the acts leading to the damage were within the insurer's "control." *Cincinnati Ins. Co.*, 306 S.W. 3d at 76 ("So focusing solely upon whether Elite intended to build a faulty house is insufficient. Rather, a court must also focus upon whether the building of the Mintmans' house was a 'chance event' beyond the control of the insured.")

Where a policy, like that at issue in *Standard Constr. Co.* and like the Grange and Owners policies, covers only damages caused by an "accident," the insured's "intent, or lack of intent, to cause injury. . . does not determine whether the policy provides coverage." *Liberty Mut. Fire Ins. Co. v. Harris*, 513 F. App'x 563, 565 (6th Cir. 2013). In *James Graham Brown Found.*, the subjective intent of the insured mattered but that was because the definition of "occurrence" in that case included "the expectations or intentions of the insured." *Id*. Later, in *Cincinnati Insurace Co.*, the Kentucky Supreme Court made clear that it was this distinction in the definition of "occurrence" that permitted a "broad, subjective standard." *Cincinnati Ins. Co.*, 306 S.W.3d at 77-78. *See also Liberty Mut. Fire Ins. Co.*, 513 F. App'x at 565.

With a policy, like that of Grange and Owners, that covers damages caused by an "occurrence" defined simply as an "accident" without reference to the insured's subjective expectations and intentions, "where *either* intent or control is present, the event is not an accident. In fact, in *Cincinnati Ins.*, the Kentucky Supreme Court found no intent, but control, and concluded that the event at issue was not an accident." *Liberty Mut. Fire Ins. Co. v. Harris*, No. 3:10-CV-582-H, 2011 WL 1157745, at *3–4 (W.D. Ky. Mar. 28, 2011) (emphasis added), *aff'd*, 513 F. App'x 563 (6th Cir. 2013); *See Cincinnati Ins. Co.*, 306 S.W.3d at 74-76.

Accordingly, there is no need for discovery into the subjective intent of the insureds with regard to the Grange and Owners policy provisions covering only property damage caused by an "occurrence."

### VII. Whether Scottsdale complied with its duty to defend by appointing counsel to represent OVC and Egnew

For the reasons discussed, neither Grange nor Owners had a duty to defend their insureds in the Blanken or LEEP actions. Scottsdale, did, however, have a duty to defend OVC, Moncrief, and Egnew in the LEEP action and to defend OVC in the Blanken action. Scottsdale sent OVC and Egnew a reservation of rights letter and appointed counsel to represent them. It did not appoint counsel to represent Moncrief. The counsel that Scottsdale appointed to represent OVC and Egnew was different than the counsel that represented Scottsdale on the coverage issue.

Nevertheless, OVC and Egnew retained their own independent counsel to represent them in the LEEP and Blanken actions. In their motion, the insureds argue that Scottsdale's duty to defend includes the duty to pay for the independent counsel they retained.

At the conference call in this matter, it was decided that the Court would first decide the threshold issue of whether the insurers had a duty to defend their insureds under the allegations of the complaint and whether any discovery on the issue was necessary.

Nevertheless, both Scottsdale and the insureds have also briefed the issue of whether Scottsdale was required to pay for the independent counsel retained by their insureds. Accordingly, the Court will resolve that issue in these motions.

OVC and Egnew argue that Scottsdale must pay for the independent counsel they retained because the "possible outcomes in the Underlying Cases could have materially affected the coverage outcomes." (DE 52-1, Mem. at 27.) It argues that, in such cases, there would be "subtle incentives" for the insurer's appointed counsel "to favor the insurer in every decision . . . ." (DE 52-1, Mem. at 27.)

The insureds concede that there is no decision from a Kentucky court supporting this position. Nevertheless, they cite a tentative draft provision of the Restatement of Liability Insurance, which provides that, when "there are facts at issue that are common to the legal action for which the defense is due and to the coverage dispute, such that the action could be defended in a manner that would benefit the insurer at the expense of the insured, the insurer must provide an independent defense of the action." Restatement of the Law of Liability Insurance § 16 Tentative Draft No. 1 (March 21, 2016).

As discussed, however, under Kentucky law, the duty to defend is determined by 1) the allegations of the complaint; 2) the "facts known" to the insurer at the time it declined coverage; and 3) where a policy provision makes it relevant, the subjective intent of the insured. OVC and Egnew do not explain how the outcomes of the underlying litigation could have been defended in a manner that would affect any of these factors.

"For independent counsel to be required, the conflict of interest must be 'significant, not merely theoretical, actual, not merely potential.'" *Fed. Ins. Co. v. MBL, Inc.*, 160 Cal. Rptr. 3rd 910, 920 (Cal. Ct. App. 2013) (quoting *Dynamic Concepts, Inc. v. Truck Ins. Exchange*, 61 Cal. App. 4th 999, 1007 (Cal. Ct. App. 1988)). The insureds point to no actual conflict. Instead

they argue that merely "potential conflicts required the insurance companies to pay for independent counsel." (DE 52-1, Mem. at 33.)

Facing a similar argument, the Fourth Circuit determined that it was "unable to conclude that the Supreme Court of South Carolina would profess so little confidence in the integrity of the members of the South Carolina Bar. Rigorous ethical standards govern South Carolina attorneys." *Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C.*, 433 F.3d 365, 373 (4th Cir. 2005). There, the court determined that the South Carolina Rules of Professional Conduct and the possibility of sanctions, public reprimand or disbarment coupled with "the threat of bad faith actions or malpractice actions if a lawyer violates these rules, provide strong external incentives for attorneys to comply with their ethical obligations." *Id.*

It is also unlikely that the Kentucky Supreme Court would presume that insurance defense counsel will behave unethically. Thus, the Court is unable to find that Kentucky courts would require that insurers pay for independent counsel anytime there is a potential conflict between a coverage issue and the merits of the underlying litigation.

Scottsdale complied with its duty to defend OVC and Egnew by appointing counsel to represent them in the LEEP and Blanken actions. However, Scottsdale breached its duty to defend Moncrief in the LEEP and Blanken actions.

## VIII. Conclusion

For all these reasons, the Court herby ORDERS as follows:

1) Owners' motion for summary judgment (DE 54) is GRANTED;

2) Grange's motion for summary judgment (DE 55) is GRANTED;

3) Scottsdale's motion for summary judgment (DE 58) is GRANTED in part and DENIED in part as follows:

a) The motion is GRANTED as to the insureds' claim that Scottsdale breached its duty to defend OVC and Egnew;

b) The motion is DENIED as to the insureds' claim that Scottsdale breached its duty to defend Moncrief in the LEEP action; and

4) The insureds' motion for summary judgment (DE 52) is GRANTED in part and DENIED in part as follows:

a) The motion is GRANTED as to the insureds' claim that Scottsdale breached the duty to defend Moncrief in the LEEP action; and

b) The motion is otherwise DENIED.

Dated September 27, 2018.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY